**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **MARK L. SHORT,**<br><br>Plaintiff,<br><br>v.<br><br>**TEXAS WORKFORCE COMMISSION,**<br><br>**TEXAS STATE UNIVERSITY,**<br><br>**DR. KELLY DAMPHOUSSE,** in his official capacity as President of TXST,<br><br>**DR. CECIL RICHARD COMPEAU JR**, in his individual capacity,<br><br>**MICHAEL MARLER,** in his official capacity as Interim Deputy Regional Director and individual capacity,<br><br>**TANISHA PICKNEY,** in her official capacity as Vocational Rehabilitation Counselor and individual capacity,<br><br>**NAKIA BRYANT**, in her official capacity as Vocational Rehabilitation Supervisor and individual capacity,<br><br>**KATE GANNON-CULLINAN**, in her individual capacity,<br><br>Defendants. | Civil Action No: 1:26-cv-01174-ADA-DH |

**PLAINTIFF'S AMENDED VERIFIED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND COMPENSATORY DAMAGES**

## I. INTRODUCTION

1. This is a civil rights action arising under Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) and Title II of the Americans with Disabilities Act (42 U.S.C. § 12131 et seq.).

2. This Amended Complaint supersedes the original Verified Complaint filed on May 4, 2026. Following the Plaintiff's initial request for emergency injunctive relief, the Defendants ignored federal mandates and executed a coordinated, multi-agency deprivation of the Plaintiff's federally protected rights, culminating in the forced eviction of a disabled student, the intentional spoliation of the vast majority of a $24,061.03 medical and vocational estate, and the ongoing unlawful retention of the surviving assets.

3. Defendants have transformed the state administrative hearing process into a bureaucratic wasteland, utilizing consecutive, unjustified "Stays" as a gag order to intentionally compress the Plaintiff's preparation timeline and exploit his visual impairment, rendering the administrative process entirely futile.

4. The Defendants engaged in "Spoliation by Proxy." The Texas Workforce Commission (TWC) intentionally starved the Plaintiff's active Workforce Innovation and Opportunity Act (WIOA) federal contract, manufacturing the financial pretext that Texas State University (TXST) utilized to deploy an armed University Police Department (UPD) squad to evict the Plaintiff on May 20, 2026.

5. Despite actual knowledge of federal "Stay Put" protections and the imminent destruction of the Plaintiff's property, TWC leadership acted with deliberate

indifference, intentionally withholding emergency transit funds. This deliberate indifference directly resulted in the July 21, 2026, destruction of the vast majority of the Plaintiff's 323-item estate—including specialized medical stabilization tools and decades of vital records—while TXST Police continue to unlawfully embargo the 18 surviving items.

6. The Plaintiff seeks compensatory and economic damages exceeding **$1.2 million** to address the State's intentional discrimination, the conversion of physical property, and the state-manufactured destruction of the Plaintiff's earning capacity.

## II. PARTIES

7. **Plaintiff Mark L. Short**

An adult resident of Galveston County, Texas. Plaintiff is an individual with qualifying disabilities under federal law, specifically cataracts, severe myopia with Recurrent Corneal Erosions (RCE) requiring specialized stabilization tools, and an inoperable torn Achilles tendon requiring a leg-brace, residing at:

Mark L. Short, BSCS
3220 69th St H8
Galveston, Texas 77551
Phone: (940) 337-7005
Email: markl_short@yahoo.com

8. **Defendant Texas Workforce Commission (TWC)**

A state agency that receives federal WIOA and Rehabilitation Act funding, thereby subjecting it to Section 504 requirements, headquartered at:

Texas Workforce Commission
101 E. 15th Street
Austin, Texas 78778

Phone: (800) 628-5115

9. **Defendant Texas State University (TXST)**

A public institution of higher education and an agency of the State of Texas that receives federal financial assistance, including federal student aid under Title IV of the Higher Education Act, subjecting it to the non-discrimination mandates of Section 504 of the Rehabilitation Act and ADA Title II, headquartered at:

Texas State University
601 University Drive
San Marcos, Texas 78666
Phone: (512) 245-2111

10. **Defendant Dr. Kelly Damphousse**

The President of **Texas State University (TXST)** is sued exclusively in his OFFICIAL capacity. TXST is a public educational entity and the designated vendor executing the Plaintiff's federally mandated Individualized Plan for Employment (IPE). Suing this Defendant in his official capacity constitutes a suit against the State of Texas and grants this Court the jurisdictional authority to mandate specific academic equitable relief. Their contact information is:

Dr. Kelly Damphousse (President)
J.C. Kellam, Room 1020, 601 University Drive
San Marcos, Texas 78666
Phone: (512) 245-2121
Email Address: president@txstate.edu

11. **Defendant Dr. Cecil Richard Compeau Jr.**

The Texas State University Professor is sued in his INDIVIDUAL capacity for compensatory and punitive damages. Acting under color of state law, Defendant Compeau operated with actual knowledge of Plaintiff's federally protected

accommodations and intentionally refused to provide digitally accessible (E-Text) materials, directly contravening a written university mandate and proximately causing the Plaintiff's academic failure and subsequent economic damages. His contact information is:

Dr. Cecil Richard Compeau Jr.
Ingram School of Engineering, IGRM 2210D
601 University Drive
San Marcos, Texas 78666
Phone: (512) 245-5610
Email: crc194@txstate.edu

**12. Defendant Michael Marler**

The interim deputy regional director is sued in his OFFICIAL capacity for prospective equitable relief, and in his INDIVIDUAL capacity for compensatory and punitive damages. At all times relevant, Defendant Marler acted under color of state law and personally ratified the retaliatory case-management blackouts and service cutbacks that proximately caused the conversion of the Plaintiff's estate. Their contact information is:

Michael Marler
1411 Brazos St.
Austin, Texas 78701
Phone: (512) 460-9286
Email: michael.marler@twc.texas.gov

**13. Defendant Tanisha Pickney, M.Ed.**

The Vocational Rehabilitation Counselor (VRC) is sued in her OFFICIAL capacity for prospective equitable relief, and in her INDIVIDUAL capacity for compensatory and punitive damages. Acting under color of state law, Defendant Pickney personally executed the retaliatory eligibility downgrade and colluded with university

vendors to deny assistive technology workflows. Their contact information is:

Tanisha Pickney, M.Ed.
4021 East 29th St, Suite 1114
Bryan, Texas 77802
Phone: (979) 595-2880
Email: tanisha.pickney@twc.texas.gov

**14. Defendant Nakia Bryant, M.S., Ed.Sp., CRC.**

The Vocational Rehabilitation Supervisor is sued in her OFFICIAL capacity for prospective equitable relief, and in her INDIVIDUAL capacity for compensatory and punitive damages. Acting under color of state law, Defendant Bryant personally enforced a retaliatory contract freeze, deployed a fabricated administrative "Catch-22"[1] to withhold federal WIOA auxiliary funds, and deliberately defied a binding administrative tribunal Order Granting Stay of Appeal. By intentionally maintaining an unlawful administrative embargo on Plaintiff's active Individualized Plan for Employment (IPE) despite actual, written notice of an impending permanent destruction deadline, Defendant Bryant proximately caused the spoliation of Plaintiff's $24,061.03 vocational and medical estate. Her contact information is:

Nakia Bryant, M.S., Ed.Sp., CRC.,
Pearland 18333 Egret Bay Blvd, Suite 590
Houston, TX 77058
Phone: (281) 333-7980
Cell: (832) 270-9086
Fax: (512) 322-2847
Email: nakia.bryant@twc.texas.gov

**15. Defendant Kate Gannon-Cullinan, Ph.D.**

[1] A Catch-22 is an impossible or paradoxical situation where you cannot do something because of a rule or condition, and you cannot fix that condition without first doing the thing you are blocked from doing. In short, it is a no-win loop where every solution creates or requires the problem itself.

Executive Director of Housing and Residential Life at Texas State University is sued in her INDIVIDUAL capacity for compensatory and punitive damages. At all times relevant, Defendant Gannon-Cullinan acted under color of state law as personally authorizing the extrajudicial sorting, appraisal, and physical destruction of the Plaintiff's medical supplies, vital legal records, and vocational tools despite possessing actual knowledge of active federal litigation holds. Her contact information is:

**Kate Gannon-Cullinan, Ph.D.,**
Executive Director of Housing and Residential Life (DHRL)
Texas State University
Housing & Residential Life
515 N. Comanche
San Marcos, Texas 78666
Phone: 512.245.4663
Email: dhrldirector@txstate.edu

## III. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 (Federal Question) and 28 U.S.C. § 1343 (Civil Rights), as this action arises under the ADA and the Rehabilitation Act.

17. This Court has subject matter jurisdiction over the Plaintiff's property deprivation and destruction claims against Defendants pursuant to Title II of the ADA, Section 504 of the Rehabilitation Act, and the Fourteenth Amendment to the United States Constitution, as the state-manufactured conversion and destruction of the Plaintiff's medical and vocational estate constitutes an operational deprivation of access to public programs and a deprivation of property without due process of law.

18. Venue is proper in the Austin Division of the Western District of Texas under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the unlawful multi-agency deprivation directly impacts the Plaintiff within this Division.

19. Defendant Texas Workforce Commission ("TWC") is a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

20. At all times relevant to this action, TWC accepted millions of dollars in federal grant allocations authorized under the Workforce Innovation and Opportunity Act ("WIOA"), 29 U.S.C. § 3101 et seq., including but not limited to WIOA Title I Adult, Dislocated Worker, and Youth funds, and WIOA Title IV Vocational Rehabilitation funds.

21. By accepting these federal WIOA funds, TWC explicitly waived its Eleventh Amendment sovereign immunity and knowingly bound itself to the non-discrimination mandates of Section 504 of the Rehabilitation Act, which dictates that no qualified individual with a disability shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

22. The specific vocational contract, individualized plan for employment (IPE), and emergency transit assistance program at issue in this lawsuit are entirely funded, managed, and executed by TWC utilizing these federal WIOA fund allocations.

23. Consequently, this Court possesses explicit subject matter jurisdiction over the

Plaintiff's Section 504 claims against Defendant TWC pursuant to 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 794, as TWC's intentional starvation of the Plaintiff's active WIOA contract constitutes discrimination by a federally funded program.

24. Defendant Texas State University ("TXST") is a public institution of higher education and a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

25. At all times relevant to this action, TXST accepted millions of dollars in federal financial assistance, including but not limited to federal student financial aid allocations under Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 et seq., as well as federal research grants and institutional awards from various federal agencies.

26. Pursuant to the Civil Rights Restoration Act of 1987, 29 U.S.C. § 794(b)(2)(A), the Section 504 non-discrimination mandate applies institution-wide to all programs, operations, and departments of TXST, including the Office of the President, Department of Housing and Residential Life, and the Texas State University Police Department ("UPD").

27. By knowingly and voluntarily accepting these federal funds, TXST explicitly waived its Eleventh Amendment sovereign immunity and bound itself to the statutory requirements of Section 504, which strictly prohibits the exclusion, denial of benefits, or discrimination against any qualified student with a disability.

28. The specific university housing programs, academic services, and campus law

enforcement actions at issue in this lawsuit—including the deployment of armed UPD officers to execute a forced eviction—occurred entirely within an institution covered by Section 504.

29. Consequently, this Court possesses explicit subject matter jurisdiction over the Plaintiff's Section 504 claims against Defendant TXST pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 794.

# IV. STATEMENT OF FACTS

## A. Plaintiff's Protected Status and Federal Accommodations

30. Plaintiff has extreme myopia, cataracts and Recurrent Corneal Erosions (RCE), which periodically causes severe eye pain, light sensitivity, and severely limited vision.

31. Plaintiff also suffers from an inoperable torn Achilles tendon, which requires the use of a leg-brace to walk. These documented conditions establish the Plaintiff as a qualified individual with a disability under Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act (ADA).

32. Plaintiff holds an active November 2025 Individualized Plan for Employment (IPE) administered by the Texas Workforce Commission (TWC), with Texas State University (TXST) acting as the designated educational vendor. *(Exhibit B, 20251104 Individual Plan for Employment (IPE))* [ECF Doc. No. 41-2]

## B. Academic Interference and Earning Capacity Destruction *(Individual-Capacity Liability of Dr. Cecil R. Compeau)*

33. To claim qualified immunity, a state official must prove their conduct did not violate

clearly established statutory or constitutional rights of which a reasonable person would have known. During the Fall 2025 semester, Texas State University Academic Faculty, specifically Dr. Cecil R. Compeau, operated with documented, actual knowledge of the Plaintiff's federally protected accommodations and consciously chose to violate them. (*Exhibit A − TXST Pattern of Noncompliance Items 1−94*) [ECF Doc. No. 36-2 at p.2]

34. On August 18, 2025, TXST Disability Services issued a formal "Notification of Disability Accommodations" directly to Dr. Compeau for the course EE 2300.001 - Circuits I. This directive explicitly mandated the provision of "Alternative Formats (E-Text)," placing Dr. Compeau on formal notice that the Plaintiff has a "disability which may make it difficult to read standard print material" and requires the provision of "electronic copies of any handouts."

35. Despite possessing actual knowledge of this federal mandate for the entirety of the semester, Dr. Compeau acted with deliberate indifference during the December 2025 final examination. Dr. Compeau intentionally refused to provide a digitally accessible (E-Text) equation sheet required for the exam.

36. The genesis of the Plaintiff's displacement began with this documented deliberate indifference. On December 9, 2025, Plaintiff provided explicit, written notice to Dr. Compeau (Instructor) and Gavin Steiger (Director of the Office of Disability Services) that the provided "Final Exam Equation Sheet" for EE 2300, Circuits I, was a mathematically illegible, pixelated image-based PDF.

37. Plaintiff's notice explicitly warned that the document violated the Plaintiff's formal

August 2025 "Alternative Formats (E-Text)" accommodations, failed standard accessibility checkers, and could not be visually processed.

38. Acting with actual knowledge of this barrier, TXST officials executed a calculated, 52-hour communication blackout. ODS Director Steiger deliberately withheld guidance and intervention from December 9 through December 11, 2025. This intentional delay provided Dr. Compeau the unchecked operational window required to assign the Plaintiff a punitive '0' for the final exam, dropping the Plaintiff's course average from a 93% to a “D”.

39. The resulting academic failure was not a reflection of merit, but the direct, calculated result of Dr. Compeau's intentional deprivation of a federally mandated accommodation.

40. On December 18, 2025, Plaintiff filed a formal Amended OEO Disability Discrimination Complaint, creating a permanent written record of Dr. Compeau's refusal to provide equitable access to course content in violation of TXST Policy UPPS 06.05.01, Texas Administrative Code (Chapters 206 & 213), and federal law.

41. In subsequent public records and administrative requests, the Texas State University Information Officer, in violation of FERPA and Texas Public Information Act (TPIA) actively withheld 1,132 academic files (education records) directly related to this dispute, specifically targeting substantive internal communications between faculty and the OEO regarding this denial of accommodations. [ECF Doc. No. 44]

42. Executive leadership, including AVP Alexandria Hatcher, subsequently weaponized standard supportive measures, demanding the Plaintiff waive formal investigation

rights in exchange for basic accessibility remedies. (*Exhibit A − TXST Pattern of Noncompliance Items 1−94*) [ECF Doc. No. 36-2 at p.6]

43. The University's refusal to cure this documented ADA violation catalyzed the academic failure that TWC-VR subsequently weaponized to justify the Plaintiff's physical displacement.

44. This coordinated academic interference directly derailed the Plaintiff's entry into a Master of Science in Computer Science (MSCS) program. The resulting delay in entry into the software engineering workforce represents an ongoing, calculable career delay valued at $160,000 annualized. Because Dr. Compeau and involved TXST personnel acted in direct contravention of a known, written accommodation mandate, their actions fall outside the scope of statutory indemnification, rendering them personally liable for this economic destruction.

## C. Actual Notice to TXST Executive Leadership and Institutional Deliberate Indifference *(TXST)*

45. On March 8, 2026, and again on March 12, 2026, Plaintiff formally escalated the ongoing academic harm to TXST executive leadership, providing actual, written notice to President Kelly Damphousse, Provost Pranesh Aswath, and the TSUS Office of General Counsel. These communications explicitly warned that the failure to provide accessible materials in Circuits I, EE 2300, coupled with the OEO's refusal to implement interim supportive measures, constituted a systemic civil rights failure that was actively compounding grading penalties.

46. Despite holding actual knowledge of the Plaintiff's formal OEO complaints (Cases

#2025899101 and #2026197001) and the documented ISO 14289-1 (PDF/UA-1) failures verified by PAC audits, TXST executive leadership consciously failed to act, maintaining total administrative silence.

47. On March 19, 2026, Dean Barrett Bryant attempted to route the federal civil rights and EIT compliance failures back through standard academic channels (Dr. Chad Booth). Plaintiff formally rejected this procedural diversion as an improper attempt to de-legalize systemic ADA and Section 504 non-compliance.

48. On March 20, 2026, Plaintiff served TXST executive leadership with a formal "Notice of Regulatory Requirements and Statement of Economic Loss," providing a final 48-hour administrative cure window. This notice quantified the $60,000 economic loss resulting from the MSCS program obstruction and instituted a formal litigation hold.

49. On March 23, 2026, having received no response and no implementation of equally effective alternate access (EEAA) prior to the expiration of the cure window, it became evident the University was operating with deliberate indifference to the Plaintiff's federal rights. Having provided TXST executives with every reasonable opportunity to cure the documented ADA and Section 504 violations, Plaintiff escalated the matter to federal oversight to halt the ongoing, unmitigated harm.

## D. Formalization of Academic Nonfeasance and Constructive Exclusion *(TXST)*

50. The OEO's April 1, 2026, Final Determination regarding Case #2025899101 cemented the University's deliberate indifference. The OEO officially determined that providing a visually impaired student with the exact same inaccessible, image-

based document provided to sighted students **"does not meet the definition of discrimination."**

51. This application of an "equal treatment" defense to a documented "failure to accommodate" claim constitutes a severe misapplication of Section 504 and ADA Title II. It legally formalizes TXST's policy of constructive exclusion, permanently stripping the Plaintiff of the academic accommodations mandated by the University's own Disability Services on August 18, 2025.

## E. TWC-VR Retaliation, Procedural Abuse and the "Zombie IPE" Protocol

52. Beginning in Spring 2026, TWC personnel, including Interim Deputy Regional Director Michael Marler and Vocational Rehabilitation Counselor (VRC) Tanisha Pickney, initiated a "Zombie IPE" protocol. This protocol kept the Plaintiff's case file active to draw down federal WIOA matching funds while constructively denying all statutory services in retaliation for the Plaintiff's participation in the TWC-VR Due Process system.

53. **Administrative Fraud & Sabotage:** The internal administrative record exposes Defendant Pickney actively falsifying internal communications to sabotage Plaintiff's Assistive Technology requests. On December 3, 2025, Plaintiff provided Pickney with detailed, written justification for Adobe Acrobat Pro, explicitly noting his need to "modify, annotate and edit the PDFs... in order to make it easier to later access and review for tests/assignments."[2] Despite possessing this written justification, Pickney

[2] See Exhibit U, 20251203 to Pickney re Acrobat License follow-up, Plaintiff's written Assistive Technology justification provided to Defendant Pickney.

intercepted the software request nearly three months later on February 25, 2026, falsely stating to internal AT Specialist Chris Fink: "he never gave me a clear justification as to why he was needing it... he never mentioned anything being an impediment due to his disability." *(Exhibit T, 20260306 TWC Internal Case Notes Documenting TXST Inter−Agency Coordination)* [ECF No. 35-9, at p.2]

54. On February 28, 2026, shattering any claim of a "misunderstanding," Plaintiff forcefully reiterated his functional limitations in a formal memorandum sent directly to Pickney, Fink, and Program Specialist Linda Robinson. Plaintiff explicitly detailed that the standard university software lacked the "advanced OCR and document structure editing required for my specific workflow," and reminded the agency that under the Rehabilitation Act, TWC-VR is the primary payer for disability-related access tools. Plaintiff established a March 5, 2026, deadline for procurement. [3]

55. Despite possessing multiple highly detailed written justifications from the Plaintiff, the Defendants consciously chose to mock the request rather than fulfill it.

- On March 6, 2026—just six days after receiving the Plaintiff's formal memorandum—Pickney and Fink engaged in back-channel collusion. Pickney falsely framed the request as a mere preference, stating: "I think he wants Adobe Pro just because honestly." *(Exhibit T, 20260306 TWC Internal Case Notes Documenting TXST Inter−Agency Coordination)* [ECF No. 35-9, at p.2]

- Fink immediately used this mischaracterization to justify a denial and abdicate

[3] See Exhibit V, 20260228 to Robinson, Pickney, Fink re Outstanding AT Support, Plaintiff's written AT follow-up and Rehabilitation Act notice to TWC-VR staff (Pickney, Fink, Robinson).

TWC's federal monitoring mandate, writing: "That isn't really a good justification, because he wants it... I am going to let the school deal with it." [ECF No. 35-9, at p.1-2]

- This unbroken chain of documentary evidence proves the state officials engaged in deliberate, bad-faith administrative fraud to deny the Plaintiff's federal accommodations.

56. **Fabricated Post-Hoc Rationalizations:** The internal administrative record demonstrates that the Defendants' stated reasons for withholding the Assistive Technology are entirely pretextual and were fabricated post-hoc (after the fact) to conceal a 17-month failure to deliver authorized WIOA services.

- The agency provided no justification for the delay until the Plaintiff began aggressively demanding civil rights compliance in February 2026.
- Only then did the Defendants scramble to manufacture a defensive paper trail, offering constantly shifting and contradictory excuses—from Pickney claiming the Plaintiff provided "no justification," to Fink claiming it was not a medical "need," to Defendant Marler ultimately abandoning both arguments on April 29, 2026, to falsely claim the agency was simply waiting on the Plaintiff to schedule an assessment.
- This documented pattern of shifting, post-dated rationalizations is a hallmark of administrative bad faith and retaliatory animus.

57. On February 25, 2026, VRC Pickney formally documented her frustration with

Plaintiff's self-advocacy, complaining in writing that the Plaintiff:

> *likes to undermine myself and does not go through appropriate channels in attempt to get what he wants.*

In the exact same paragraph, she explicitly committed her retaliatory intent to writing, stating:

> *I am in the process of having his vision re-evaluated because... he does not meet BVI requirements.*

By explicitly linking her intent to strip a disabled citizen of their blindness eligibility to her frustration over his civil rights advocacy—nearly two weeks before the actual medical eye exam on March 10, 2026—Defendant Pickney provided absolute documentary proof of premeditated retaliation under Section 504 and Title II of the ADA. (*Exhibit K, TWCVR BVI Downgrade Intent*) [ECF Doc. No. 11-4]

58. On March 6, 2026, back-channel communications involving TWC staff (Chris Fink) and TXST Office of Disability Services (Gavin Steiger) took place, explicitly abdicating federal monitoring mandates to the university. *(Exhibit T, 20260306 TWC Internal Case Notes Documenting TXST Inter−Agency Coordination)* [ECF Doc. No. 35-9]

59. On March 23, 2026, precisely executing the premeditated threat documented a month prior, Pickney finalized the retaliatory downgrade of the Plaintiff's Blind and Visually Impaired (BVI) eligibility status. (*Exhibit K, TWCVR BVI Downgrade Notice*) [ECF Doc. No. 11-4, at p.2]

60. Despite this documented retaliatory downgrade, Defendant Marler brazenly

attempted to conceal the Agency's actions during the April 29, 2026, status conference. In a bad faith attempt to bury the local office's retaliation, Defendant Marler falsely asserted on the official audio record that “there has been no denial and there has been no change in your status as a person with a visual impairment.” (*Exhibit T-H, Transcripts*) [ECF No. 11-1, at p.130]

61. On March 16, 2026, Plaintiff engaged in legally protected activity by seeking resolution for the denial of accessible services through the TWC-VR impartial due process hearing system (TWC VR Docket No. 2026-27). (*Exhibit B, TWCVR Formal Petitions for Due Process Hearing*) [ECF Doc. No. 36-3] Rather than providing a prompt and equitable resolution, the state agency weaponized the tribunal to cause administrative attrition and execute a coordinated campaign of retaliation.

62. On April 9, 2026, at 6:00 p.m., the Impartial Hearing Officer (IHO) issued an Order staying all pleadings without providing a single finding of fact or legal justification. (*Exhibit Q06, Record of IHO Orders*) [ECF Doc. No. 11-2 at p.25], *(Exhibit D, April 2026 [TWCVR Due Process] Filing Blackout Calendar)* [ECF Doc No. 1-5]

63. On April 22, 2026, the state administrative tribunal escalated its procedural stonewalling by issuing a decision denying the Plaintiff’s request for a basic, clerical index of the docket. Simultaneously, the tribunal maintained a "stay" operating as a functional gag order, prohibiting the Plaintiff from filing formal written motions. (*Exhibit Q08, Record of IHO Orders*) [ECF Doc. No. 11-2 at p.29] The tribunal effectively operated a “shadow docket,” actively concealing which documents, motions, and ex parte communications were considered “on the record” (*Exhibit C,*

*Timeline of Due Process Deprivations*) [ECF Doc. No. 1-4], with the IHO formally admitting on the audio record that the tribunal "doesn't keep an official docket' and tracks the official record utilizing her "own notebook." (*Exhibit T-H, Transcripts*) [ECF Doc. No. 11-1, at p.45-46]

64. Denying a visually impaired, pro se litigant a chronological index of the case file while enforcing a gag order constitutes an insurmountable barrier to participation.

65. On the morning of April 29, 2026, the Plaintiff filed a formal written objection explicitly notifying the state tribunal of the imminent May 1st housing liability deadline and demanding mandatory interim relief under 34 C.F.R. § 361.57(b)(4). Despite this written notice, the IHO explicitly abdicated her authority on the audio record later that morning, stating "I don't know that I have authority to issue any orders" and "If you need to go to court and get a TRO or take other action against TWC, I can't stop you." (*Exhibit T-H, Transcripts*) [ECF Doc. No. 11-1, at p.131]

66. The Agency intentionally exploited the Plaintiff's disability to force a procedural default by semi-permanently freezing the docket and compressing the mandatory May 5th evidence disclosure timeline and May 14th hearing timeline. Administrative exhaustion is futile due to the following ongoing administrative barriers:

- **Evidentiary Suppression and PII Breaches:** The Defendants contaminated the Plaintiff's vocational record with the Personally Identifiable Information (PII) of two completely unrelated clients (Case IDs 2023940 and 1816166). When the Plaintiff formally reported this catastrophic breach, the Agency intentionally withheld formal notice of the breach from the docket for 42 hours. The IHO then

utilized an unformalized, retroactive 'Stay' as an illegal gag order to actively suppress the Plaintiff from reporting the breach on the administrative record. *(Exhibit R, Appellant's Motion for Judicial Notice)* [ECF Doc. No. 11-3 at p.182-190], (*Exhibit C, Timeline of Due Process Deprivations*) [ECF Doc. No. 1-4, at p.3-4]

- **Financial Barriers**: The Agency weaponized state administrative rules (40 TAC §850.78) to withhold accessible written transcriptions of the proceedings, attempting to impose an artificial financial barrier by ruling on the audio record that obtaining a transcript would be "at your cost." (*Exhibit T-H, Transcripts*) [ECF Doc. No. 11-1, at p.137]

- **Catch-22 Adjudication**: The IHO arbitrarily narrowed the scope of the proceedings to explicitly exclude the Plaintiff's core civil rights grievance: the functionally inaccessible educational environment at the vendor institution. *(Exhibit Q10, ORDER DENYING APPELLANT'S NOTICE OF OBJECTION TOPRE-HEARING ORDER, REQUEST FOR RESTATEMENT OF CONTESTED ISSUES, AND MOTION TO CONSOLIDATE DOCKET)* [ECF Doc. No. 11-2, at p.33]

67. During the April 29, 2026, teleconference, Defendant Marler falsely asserted that running standard Optical Character Recognition (OCR) on the Plaintiff's digital file would require "300+ man-hours and $10,000+." Because batch-OCR is an automated, enterprise-standard software process that requires mere minutes of actual human interaction, this fabricated metric proves the Defendants' "undue

burden" defense is entirely pretextual. (*Exhibit T-H, Transcripts*) [ECF Doc. No. 11-1, at p.103-104]

## F. The Vendor-Agent Nexus and WIOA Contract Starvation

68. TeShawn Ferguson structurally obstructed the Plaintiff's due process rights, orchestrating a contract starvation that intentionally withheld required medical, maintenance, and assistive technology funds.

69. The Defendants purposefully mislabeled retroactive academic debts, creating a fabricated $1,776.52 deficit on the Plaintiff's "Supportive Maintenance" ledger.

70. TWC utilized a fabricated administrative paradox to starve the contract: TWC-VR Supervisor Nakia Bryant documented in writing (*Exhibit A, 20260917 Bryant Conferral Correspondence*) [ECF Doc. No. 42-1, at p.2] that auxiliary maintenance funds were denied because the Plaintiff was not participating in a "primary service," while simultaneously blocking the very funds and assistive technology required for the Plaintiff to participate in that primary service."

71. Following the eviction, TXST personnel executed an off-book conversion of the Plaintiff's high-value vocational assets. The State Confiscation Inventory Summary cataloged 323 distinct items that were unlawfully seized. While the vast majority of this $24,061.03 estate was subsequently destroyed on July 21, 2026—including vital legal records, daily living necessities, physical software engineering work-product, and specialized medical stabilization tools—a fraction of the estate survived. *(Exhibit B, 20260615 TXST Spoliation Ledger (07_21))* [ECF Doc. No. 42-2]

72. The arbitrary and extrajudicial nature of the university's 'audit' is irrefutably

documented on a September 17, 2026, internal inventory transmitted by TXST UPD. The UPD officially cataloged the preservation of exactly 18 items currently remaining in their possession:

- two Alienware laptops,
- a Dell monitor,
- three Samsung 43" televisions,
- two Craftsman tool kits,
- an iRobot Roomba,
- a Kuroscale,
- a clothes iron,
- a box containing prescription (Rx) glasses and miscellaneous cables,
- alongside assorted kitchen appliances (a toaster, Crock Pot, NutriBullet, and Cuisinart coffee maker and kettle).

73. The Plaintiff proactively escalated the impending destruction of these remaining assets to TWC executive leadership, formally requesting the release of authorized WIOA freight transit funds to rescue and transport these 18 surviving items from TXST UPD custody.

74. On September 16, 2026, Plaintiff contacted TWC VRC Villareal and subsequently on September 17, 2026, Supervisor Nakia Bryant to coordinate emergency freight transit necessary to rescue and secure the surviving 18 items—including the Alienware laptops, monitors, and prescription glasses—from an imminent September 19, 2026, permanent destruction deadline scheduled by the TXST University Police Department. *(Exhibit A, Bryant Conferral Correspondence)* [ECF

Doc. No. 42-1]

## G. The May 20 Armed Eviction

75. On May 20, 2026, TXST weaponized this manufactured deficit. The university deployed an armed University Police Department (UPD) squad to physically force the Plaintiff from his vocational housing and issue a Criminal Trespass Warning (CTW) to Plaintiff. (*Notice of Realized Irreparable Harm*) [ECF Doc. No. 16]

76. On May 22, 2026, TWC paid the $9,000+ balance—just 48 hours after the armed eviction—proving the eviction was a coordinated, punitive escalation rather than a legitimate fiscal necessity. (*Exhibit B, TXST Acct Stmnt Spring 2026*) [ECF Doc. No. 43-03]

## H. Deliberate Indifference and the July 21 Spoliation Event

77. Following the eviction, TXST personnel executed an off-book conversion of the Plaintiff's high-value vocational assets. The State Confiscation Inventory Summary cataloged 323 distinct items that were unlawfully seized. While the vast majority of this $24,061.03 estate was subsequently destroyed, the full catalog of unlawfully converted property included:

- **Medical & BVI Equipment:** Multiple distinct prescription medications explicitly cataloged by the State, 5 pairs of backup corrective glasses, and specialized medical stabilization tools required for vision management.

- **Technical Infrastructure:** Dual 42-inch LED computer monitors, specialized stands, docking stations, multiple USB storage devices (including a Halo

memory unit), peripherals, boxes of electronic components, and high-end power supplies.

- **Vital & Historical Records:** Decades of federal tax and retirement records, mother's death certificate (seized with her wallet, checkbook, and wedding certificate), irreplaceable family artifacts, and earned military medals/patches.
- **Necessities of Life:** All personal luggage, clothing, shoes, dishes, cooking utensils, bedding, and daily living hygiene supplies.
- **Career & Legal:** Physical and electronic software engineering work-product, source code, licensed software installation media, educational/vocational assets, and evidentiary documents.

78. The bad faith of the university's extrajudicial 'audit' is irrefutably documented in a September 17, 2026, internal inventory transmitted by TXST UPD. While the majority of Plaintiff's 323-item estate was converted or destroyed, the UPD officially cataloged the preservation of 18 of the 323-items to include 'Toaster,' a 'Crock Pot,' and a 'Cuisinart Coffee Maker,' while entirely failing to safeguard the Plaintiff's essential medical stabilization tools, decades of vital records, and remaining engineering infrastructure.

79. The Plaintiff proactively escalated the impending destruction to TWC executive leadership, formally requesting the release of authorized WIOA freight transit funds to rescue the estate.

## I. The Manufactured Administrative Catch-22 and "Stay Put"

**Violation** *(TWC-VR)*

80. On September 16, 2026, Plaintiff contacted TWC VRC Villareal and subsequently on September 17, 2026, Supervisor Nakia Bryant to coordinate emergency freight transit necessary to rescue and secure the remaining vital BVI vocational technology, life-sustaining medical supplies, and career work-product from an imminent September 19, 2026, permanent destruction deadline scheduled by the TXST University Police Department. (*Exhibit A, Bryant Conferral Correspondence*) [ECF Doc. No. 42-1]

81. On September 17, 2026, VR Supervisor Bryant issued a formal administrative refusal to authorize the emergency freight transit. Citing Texas Vocational Rehabilitation Services Manual (VRSM) Chapter C-1400, Section C-1401-1, Defendant TWC asserted that supportive services are strictly dependent on an active primary VR service, and because Plaintiff was not actively enrolled in classes, the primary service was "inactive," rendering emergency supportive services policy-prohibited.

82. This administrative justification constituted a bad-faith, manufactured paradox. Defendant TWC utilized its own prior financial defaults—which directly triggered the forced disruption of Plaintiff's physical housing and the initial seizure of his life-sustaining BVI vocational equipment—as the legal baseline to deny the exact emergency transit funding required to retrieve those vocational tools. Defendant TWC deliberately locked Plaintiff in a constructive "Catch-22": stripping him of the physical capacity to participate in the primary educational service, and then utilizing that forced non-participation to legally bar the recovery of his assets.

83. In that same September 17, 2026, communication, Defendant TWC explicitly attempted to condition the emergency recovery of Plaintiff's property on Plaintiff executing a comprehensive "IPE Modification" to remove or alter his vested post-secondary educational goals.

84. Plaintiff explicitly provided VR Supervisor Bryant with a copy of the May 5, 2026, Order Granting Stay of Appeal signed by IHO June A. Mann in *Mark L. Short v. Texas Workforce Commission* (*TWC VR Docket No. 2026-27). (Exhibit Q19, ORDER GRANTING STAY OF APPEAL*) [ECF Doc. No. 11-2, at p.61-62] This official agency order explicitly established that a formal administrative due process proceeding had been actively pending and stayed since May 2026 specifically because of the pending federal court litigation.

85. By operation of federal law (29 U.S.C. § 722(c)(8)(A) and 34 C.F.R. § 361.57(b)(4)), as well as TWC's internal regulations, the existence of an active, stayed administrative dispute strictly prohibited Defendant TWC from unilaterally altering, reducing, or conditioning Plaintiff's active November 2025 IPE status quo.

86. Despite receiving irrefutable, written notice of its own tribunal's active stay order, Defendant TWC consciously bypassed federal "stay put" protections. The agency actively maintained its unlawful administrative embargo on Plaintiff's vocational property, choosing to let the critical September 19, 2026, liability deadline mature rather than honor its statutory obligation to preserve the client's vested services and status quo.

87. **Formal Litigation Hold and Impossibility of Retrieval:** On October 30, 2026, the

Plaintiff served a formal, time-stamped "Notice of Litigation Hold and Demand for Preservation of Evidence" directly upon Assistant Attorney General Elizabeth Bryan, counsel of record for the Defendants. This Notice explicitly informed the State's counsel that it is both legally and physically impossible for the Plaintiff to retrieve the 18 surviving items in person. The Plaintiff is legally barred from the TXST campus under threat of arrest via an active Criminal Trespass Warning (CTW) and physically barred by severe visual and mobility impairments that prevent driving from Galveston. The Notice formally warned the Defendants that the State of Texas cannot simultaneously ban a disabled citizen from its premises under threat of arrest, embargo the federal WIOA transit funds required to transport his property, and then claim he "abandoned" it. The Plaintiff explicitly warned the AAG that any failure to secure the 18 surviving items would constitute a direct, willful violation of the Magistrate Judge's October 19, 2026, Order [ECF Doc. No. 49], which explicitly stated that "[t]he Parties duty to preserve evidence continues during a stay." [4]

## J. Written Proof of Institutional Deliberate Indifference

88. To establish liability for compensatory damages under Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act, a plaintiff must demonstrate that the public entity acted with deliberate indifference—requiring proof that an official with authority to address the alleged discrimination had actual knowledge of the violation and failed to act.

89. On September 19, 2026, Plaintiff transmitted formal, written notice to TWC-VR

[4] *See Exhibit X, 20261030 to AAG, URGENT: Notice of Litigation Hold and Demand for Preservation of Evidence*

Supervisor Nakia Bryant. This transmission explicitly identified the impending destruction deadline for Plaintiff's seized property at TXST and attached the IHO's May 5, 2026, Order Granting Stay of Appeal, confirming the agency was legally prohibited from withholding services under federal "stay put" mandates.

90. On September 21, 2026, acting with actual knowledge of the risk and conscious disregard for the Plaintiff's civil rights (*Cadena v. El Paso County*), VR Supervisor Bryant replied:

> *Perhaps one of the other individuals listed in this email thread can be of assistance to you. Have a great day.*[5]

91. This explicit refusal to intervene represents the pinnacle of institutional deliberate indifference. A supervisory state official, uniquely empowered to clear administrative logjams and enforce federal grant compliance assurances, consciously chose to brush off documented violations of federal law as an administrative nuisance.

92. The vast majority of the 323-item estate, representing a catastrophic loss of the Plaintiff's $24,061.03 vocational infrastructure, was permanently destroyed as the direct, proximate result of this coordinated, multi-agency deliberate indifference. (*Exhibit B, 20261004 to TWC, TXST Notice of Spoliation Damages*) [ECF Doc. No. 45-2]

93. Defendant TWC did not commit a clerical error; it executed a calculated, bad-faith operational decision. By deploying conflicting internal manual standards to deliberately starve a federal contract and permitting local offices to ignore active

[5] See Exhibit W, 20260921 Bryant re NOTICE OF ADMINISTRATIVE CONTRADICTION: Active Stay Order (Docket No. 2026-27) vs. IPE Modification Demands

administrative stay orders, agency leadership consciously maximized the compounding financial liability now affixed to the involved state employees. This coordinated evasion of duty directly resulted in severe, irreversible deprivations of Plaintiff's civil rights, statutory benefits, and life-sustaining physical property.

## K. TWC Executive Notice and Ratification of Deliberate Indifference

94. The Plaintiff proactively escalated the impending destruction to TWC executive leadership (Joe Esparza, Steve Pier, Alberto Trevino, Brent Connett) and General Counsel (John Tucker) via a "Notice of Executive Escalation."

95. By allowing the October 9, 2026, 5:00 PM cure deadline to lapse, TWC Executive Leadership officially ratified the constitutional deprivations executed by their subordinates, permanently cementing the agency's liability under the Fifth Circuit’s *Cadena* standard for deliberate indifference.

# V. CAUSES OF ACTION

## COUNT I: VIOLATION OF ADA TITLE II AND SECTION 504 (DELIBERATE INDIFFERENCE) *(Against Entity Defendants: TWC and TXST)*

96. Plaintiff realleges and incorporates by reference all preceding paragraphs.

97. To recover compensatory damages under Title II and Section 504, a plaintiff must establish that the public entity acted with deliberate indifference, meaning an official with authority to address the discrimination possessed actual knowledge of the violation and responded with a deliberate failure to act. *Cadena v. El Paso County*, 946 F.3d 717 (5th Cir. 2020); *Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565 (5th Cir. 2018).

98. Defendant TWC is a "public entity" under 42 U.S.C. § 12131(1), and Plaintiff is a "qualified individual with a disability" under 42 U.S.C. § 12131(2) due to visual and mobility impairments that substantially limit major life activities.

99. Defendants TWC and TXST exhibited systemic deliberate indifference to Plaintiff's civil rights through the following coordinated actions:

- **The Digital Paywall:** TWC intentionally failed to provide Plaintiff with meaningful access to his own administrative records, knowingly utilizing a natively inaccessible case management system to transmit image-only, non-text-searchable ("Dead") PDFs.
- **Fabricated Defenses:** TWC asserted a bad-faith and pretextual "undue burden" defense, claiming under oath that providing accessible files would require a $21,000 IT project, despite Plaintiff demonstrating that batch-OCR compliance requires mere minutes using standard software.
- **Academic Obstruction:** TXST failed to provide an accessible academic environment, directly contradicting its own August 2025 accommodation mandates, while TWC explicitly abdicated its federal vendor monitoring duties.

100. TWC further violated Section 504 by exhibiting conscious disregard for the spoliation of Plaintiff's estate. As established by the September 21, 2026, written transmission, TWC executives possessed actual knowledge of the impending property destruction but deliberately failed to authorize emergency freight transit to rescue it.

## COUNT II: RETALIATION IN VIOLATION OF ADA TITLE II AND SECTION

**504***(Against Entity Defendants: TWC and TXST)*

101. Plaintiff realleges and incorporates by reference all preceding paragraphs.

102. Both Section 504 of the Rehabilitation Act and Title II of the ADA strictly prohibit retaliation, coercion, intimidation, or interference against any individual who has opposed discriminatory practices or participated in a grievance proceeding (28 C.F.R. § 35.134).

103. Plaintiff engaged in legally protected activity by advocating for digital accessibility, issuing formal notices of civil rights violations to TXST, and officially requesting an Impartial Due Process Hearing in March 2026.

104. In direct response to this protected activity, the Entity Defendants executed a coordinated retaliatory campaign:

- Exactly one week after Plaintiff filed for a Due Process Hearing, TWC unilaterally and punitively downgraded Plaintiff's BVI eligibility status without medical justification.
- TWC utilized this arbitrary downgrade as an administrative pretext to maliciously freeze Plaintiff's vital Supportive Maintenance funds.
- TXST weaponized the resulting federally-backed financial balance to execute a retaliatory eviction.

105. The immediate temporal proximity of the BVI downgrade to the Due Process request, coupled with the bad-faith obstruction of Assistive Technology procurement and subsequent administrative gag orders, demonstrates undeniable retaliatory

animus.

**COUNT III: FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983** *(Against Individual-Capacity Defendants: Pickney, Marler, and Bryant)*

106. Plaintiff realleges and incorporates by reference all preceding paragraphs.

107. A state official commits First Amendment retaliation when they take an adverse action substantially motivated by a plaintiff's constitutionally protected activity. *Keenan v. Tejeda*, 290 F.3d 252 (5th Cir. 2002).

108. Plaintiff engaged in constitutionally protected petitioning by filing formal grievances with the TXST OEO and the TWC-VR Due Process system.

109. Defendants Pickney, Marler, and Bryant acted with intentional malice and clear retaliatory intent, executing adverse actions designed to chill a person of ordinary firmness. Specifically, they purposefully manipulated Plaintiff's eligibility records, withheld mandated administrative Notices of Decision to prevent legal escalation, and initiated the "Zombie IPE" contract starvation protocols.

**COUNT IV: FOURTH AMENDMENT UNREASONABLE SEIZURE UNDER 42 U.S.C. § 1983***(Against Individual-Capacity Defendants: Gannon-Cullinan, Marler, and Bryant)*

110. Plaintiff realleges and incorporates by reference all preceding paragraphs.

111. The Fourth Amendment protects against unreasonable civil seizures that meaningfully interfere with an individual's possessory interests in their property. *Soldal v. Cook County*, 506 U.S. 56 (1992).

112. The Individual-Capacity Defendants orchestrated an unreasonable civil seizure by

deliberately manufacturing the financial gridlock that forced Plaintiff’s physical eviction.

113. Defendant Gannon-Cullinan acted with egregious bad faith. After being served with explicit, time-stamped federal preservation holds, she bypassed standard judicial process and authorized an item-by-item "technical audit" of the Plaintiff's room. She consciously directed the preservation of generic kitchen appliances (e.g., a toaster) while ordering the permanent destruction of life-sustaining medications, family lineages, and technical infrastructure.

114. This deprivation was not a "random and unauthorized" act by rogue employees that could be cured by post-deprivation state remedies. *See Parratt v. Taylor*, 451 U.S. 527 (1981); *Hudson v. Palmer*, 468 U.S. 517 (1984). Rather, it was a calculated, coordinated deprivation executed under the authority of state policy and explicitly ratified by TWC executive leadership.

## COUNT V: FOURTEENTH AMENDMENT DEPRIVATION OF DUE PROCESS AND EQUAL PROTECTION UNDER 42 U.S.C. § 1983 *(Against Individual-Capacity Defendant: Dr. Cecil Richard Compeau Jr.)*

115. Plaintiff realleges and incorporates by reference all preceding paragraphs.

116. The Fourteenth Amendment prohibits state actors from depriving any person of property or liberty without due process of law, and guarantees equal protection under the law.

117. Defendant Compeau, acting under color of state law as an academic official of Texas State University, intentionally and maliciously deprived Plaintiff of equal access to his public educational program.

118. Operating with documented, actual knowledge of the August 18, 2025, formal "Notification of Disability Accommodations" issued by TXST Disability Services, Defendant Compeau acted with egregious bad faith by intentionally refusing to provide a digitally accessible (E-Text) equation sheet during a critical examination.

119. Defendant Compeau utilized this intentional deprivation of a federally mandated accommodation to assign the Plaintiff a punitive grade, directly causing a severe academic failure. This bad-faith obstruction directly derailed Plaintiff's entry into a Master of Science in Computer Science (MSCS) program, proximately causing a calculable, permanent destruction of Plaintiff's vocational earning capacity.

## COUNT VI: CLAIM FOR PROSPECTIVE INJUNCTIVE RELIEF UNDER THE EX PARTE YOUNG DOCTRINE (*Against Defendant Bryant in her Official Capacity)*

120. Plaintiff realleges and incorporates by reference all preceding paragraphs.

121. Under the *Ex parte Young* doctrine, the Eleventh Amendment does not bar suits against state officials in their official capacities when the plaintiff seeks prospective injunctive relief to halt an ongoing violation of federal law.

122. Defendant Bryant, acting in her official capacity as VR Supervisor for TWC, is engaged in an ongoing, continuous violation of federal law by enforcing a retaliatory "Catch-22" contract freeze and refusing to authorize statutory services under

Plaintiff's active federal Individualized Plan for Employment (IPE) in violation of the Workforce Innovation and Opportunity Act (WIOA) and 34 C.F.R. § 361.57.

123. Plaintiff seeks a prospective, mandatory injunction ordering Defendant Bryant to immediately lift the unlawful administrative embargo on Plaintiff's account, restore the disbursement of contracted IPE auxiliary maintenance funds, and comply with all federal "stay put" mandates pending the resolution of this litigation.

**COUNT VII: STATE LAW PROPERTY CONVERSION & BAILMENT VIOLATIONS (28 U.S.C. § 1367)** *(Against Defendant TXST)*

124. Plaintiff incorporates all preceding paragraphs.

125. By seizing, failing to safeguard, and ultimately destroying 323 cataloged items of the Plaintiff's personal, medical, and vocational property—despite active litigation holds and federal stay orders—TXST committed unlawful conversion of property under Texas state law.

## VI. INAPPLICABILITY OF QUALIFIED IMMUNITY

126. The Individual-Capacity Defendants are not entitled to qualified immunity. Their conduct violated clearly established statutory mandates and binding internal tribunal orders of which any reasonable official would have known.

127. The Individual-Capacity Defendants possessed actual knowledge that their targeted, extrajudicial actions would inflict severe economic devastation, physical regression, and a permanent destruction of the Plaintiff's vocational earning capacity.

128. Even absent a materially identical prior case, the constitutional violations executed by the Defendants were so obvious that no reasonable official could have believed

their conduct was lawful. *Hope v. Pelzer*, 536 U.S. 730 (2002); *Taylor v. Riojas*, 141 S. Ct. 52 (2020).

- **Defendant Compeau:** No reasonable professor could believe that intentionally withholding a digitally accessible equation sheet in direct, deliberate defiance of an August 18, 2025, formal "Notification of Disability Accommodations" directive is lawful.

- **Defendants Bryant and Gannon-Cullinan:** No reasonable state official could believe that ignoring a binding tribunal *Order Granting Stay of Appeal* (enforcing 29 U.S.C. § 722(c)(8)(A)) to actively facilitate the permanent destruction of a disabled citizen's prescription medical equipment and vocational infrastructure is lawful.

- **Defendant Marler:** No reasonable state official could believe that asserting an objectively false and mathematically absurd "undue burden" defense—fabricating a claim on the administrative tribunal record that running standard, automated Optical Character Recognition (OCR) on a digital case file requires 300+ man-hours and tens of thousands of taxpayer dollars—in order to deliberately block a visually impaired citizen from accessing his own administrative records is lawful.

129. Because their bad-faith actions violate clearly established federal law, they are completely stripped of protection under the doctrine of qualified immunity, rendering them jointly and severally liable for compensatory and punitive damages.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court assume jurisdiction over this matter and grant the following relief:

### A. Declaratory Relief

1. Entry of a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring that the policies, practices, actions, and omissions of Defendants as alleged herein violate Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

2. A declaration stating that the Defendants' coordinated actions, including the "Zombie IPE" starvation and the Spoliation by Proxy, violated the Plaintiff's federally protected civil rights.

### B. Equitable & Injunctive Relief

1. **Injunctive Relief (WIOA Enforcement & Institutional Transfer):** Issue a Permanent Injunction directing TWC-VR to permanently resume the active Individualized Plan for Employment (IPE), waive standard "Best Value" purchasing constraints as compensatory education, and immediately authorize and fully fund the Plaintiff's MSCS transition at a fully compliant university of his choosing.

2. **The Financial Cure (Ledger Strike):** Order the immediate strike of the $1,776.52 in mislabeled retroactive academic debts from the "Supportive Maintenance" ledger and mandate the immediate disbursement of the withheld medical funds.

3. **Injunctive Relief (Academic Corrections):** A federal order compelling Defendant TXST to execute the immediate, retroactive correction of the Plaintiff's EE 2300 (Circuits I) grade to an 'A' to reflect accurate academic merit, and the complete administrative withdrawal (without penalty) of all Spring 2026 courses compromised by institutional interference.

## C. Legal Relief & Damages

1. **Compensatory Damages:** Actual, compensatory damages for intentional discrimination and deliberate indifference under Title II of the ADA and Section 504 of the Rehabilitation Act, reflecting the severe emotional distress, dignitary harm, and the state-manufactured destruction of the Plaintiff's earning capacity (calculated at an annualized delay value of $160,000), in an amount to be determined by a jury, but no less than **$1,200,000.00**.

2. **Economic Property Damages:** Actual economic damages in the amount of **$24,061.03** for the unlawful conversion and spoliation of the 323-item State Confiscation Inventory, including vital medical equipment and software engineering infrastructure.

3. **Punitive Damages:** Award punitive damages against the Individual-Capacity Defendants in their personal capacities pursuant to 42 U.S.C. § 1983 to punish their egregious, bad-faith, and malicious violation of clearly established federal civil rights.

## D. General Relief

1. **Costs:** Award the Plaintiff all costs of litigation, including but not limited to PACER fees, service of process fees, and mailing costs.

2. Award Plaintiff pre-judgment and post-judgment interest at the highest legal rate.

3. Grant such other and further relief as the Court deems just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury on all issues so triable.

## IX. VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that the factual allegations contained herein are based upon my own personal knowledge.

Executed on this _30th_ day of October, 2026.

---

*/s/ Mark L. Short*
______________________

**Mark L. Short**, BSCS
Plaintiff, *Pro Se*
3220 69th St H8
Galveston, Texas 77551
Phone: (940) 337-7005
Email: markl_short@yahoo.com

Dated: October 30, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to counsel of record.

**Counsel for Defendants (TWC, Marler, Pickney):**

**Elizabeth Bryan**
Assistant Attorney General
General Litigation Division
Office of the Attorney General of Texas
P.O. Box 12548
Capitol Station, MC-019
Austin, TX 78711-2548
Phone: 737-230-4700
Email: elizabeth.bryan@oag.texas.gov

Additionally, to satisfy the "actual notice" requirements of Fed. R. Civ. P. 65(d)(2)(C) and legally bind non-parties acting in active concert and participation with the Defendants, a true and correct copy of this filing has been served via direct electronic mail transmission to the following university administrators and legal officers:

**Office of the General Counsel**
Texas State University System (TSUS)
O. Henry Hall
601 Colorado Street
Austin, TX 78701-2904
Phone: (512) 463-1808
Email: tsusgencoun@txstate.edu

Respectfully Submitted,

*/s/ Mark L. Short*

______________________

**Mark L. Short**, BSCS
Plaintiff, *Pro Se*
3220 69th St H8
Galveston, Texas 77551
Phone: (940) 337-7005
Email: markl_short@yahoo.com

Dated: October 30, 2026

# INDEX OF EXHIBITS

**Exhibit U** ........ Email correspondence (Dec 3, 2025) – Plaintiff’s written Assistive Technology justification provided to Defendant Pickney.

**Exhibit V** ........ Formal Memorandum (Feb 28, 2026) – Plaintiff’s written AT follow-up and Rehabilitation Act notice to TWC-VR staff (Pickney, Fink, Robinson).

**Exhibit W** ....... Email correspondence (Sep 21, 2026) – Defendant Bryant’s refusal to authorize emergency freight transit ("Have a great day").

**Exhibit X** ........ Notice of Litigation Hold (Oct 30, 2026) – Plaintiff’s formal demand to the Assistant Attorney General for the preservation of 18 surviving items.