**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| **MARK L. SHORT,**<br><br>Plaintiff,<br><br>v.<br><br>**TEXAS WORKFORCE COMMISSION,**<br><br>**TEXAS STATE UNIVERSITY,**<br><br>**DR. KELLY DAMPHOUSSE,** in his official capacity as President of TXST,<br><br>**DR. CECIL RICHARD COMPEAU JR**, in his individual capacity,<br><br>**MICHAEL MARLER,** in his official capacity as Interim Deputy Regional Director and individual capacity,<br><br>**TANISHA PICKNEY,** in her official capacity as Vocational Rehabilitation Counselor and individual capacity,<br><br>**NAKIA BRYANT**, in her official capacity as Vocational Rehabilitation Supervisor and individual capacity,<br><br>**KATE GANNON-CULLINAN**, in her individual capacity,<br><br>Defendants. | Civil Action No: 1:26-cv-01174-ADA-DH |

# PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS [ECF 62]

Pursuant to Local Rule CV-7, Plaintiff Mark L. Short, *pro se*, opposes Defendants' Motion to Dismiss. [ECF Doc. No. 62]

# I. DEFENDANTS' RULE 12(b)(1) SOVEREIGN IMMUNITY DEFENSE FAILS AS A MATTER OF LAW

Before reaching the factual deficiencies of Defendants' motion, their jurisdictional challenges under Fed. R. Civ. P. 12(b)(1)—contesting Article III standing and asserting Eleventh Amendment sovereign immunity—fail as a matter of law.

## A. Plaintiff Establishes Article III Standing

Under *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992), a plaintiff establishes standing by pleading (1) an injury-in-fact, (2) fairly traceable to the defendants' conduct, and (3) redressable by a favorable decision. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct suffice. *Id*. at 561.

Plaintiff satisfies all three elements through anchored documentary proof:

- **Concrete Injuries:** Plaintiff pleads a documented $60,000 career delay from inaccessible administrative records, the elimination of Rehabilitation Technology and in-house Counseling and Guidance following the retaliatory BVI transfer, and the $24,061.03 spoliation of his vocational and medical estate.

- **Traceability:** Each injury traces directly to TWC's verified acts—specifically Defendant Marler's sworn refusal to provide OCR-searchable files without a $10,000–$21,000 fee, Defendant Pickney's documented retaliatory case transfer, and Defendants' bad-faith financial embargo despite on-the-record notice of Plaintiff's May 1, 2026, housing deadline.

- **Redressability:** Compensatory damages under Section 504 and 42 U.S.C. § 1983, coupled with prospective injunctive relief under *Ex parte Young*, directly redress these ongoing injuries.

### B. Sovereign Immunity Is Statutorily Waived and Abrogated

Defendants assert Eleventh Amendment sovereign immunity to shield the Texas Workforce Commission (TWC) and Texas State University (TXST) from liability. This defense ignores explicit statutory waiver and congressional abrogation.

Pursuant to 42 U.S.C. § 2000d-7(a)(1), "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973."

While § 2000d-7 bars immunity for Plaintiff's Rehabilitation Act claims, Plaintiff's § 1983 claims for monetary damages are properly directed against Defendants in their **individual capacities**, and prospective injunctive relief proceeds under *Ex parte Young*.

The Fifth Circuit strictly enforces § 2000d-7, holding that state agencies knowingly

and voluntarily waive sovereign immunity by accepting federal financial assistance. *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 281 (5th Cir. 2005) (en banc). TWC and TXST operate programs funded by federal allocations. Defendants cannot invoke sovereign immunity to strip this Court of jurisdiction while simultaneously consuming the federal funds conditioned entirely upon its waiver.

Defendants' reliance on *United States v. Georgia*, 546 U.S. 151, 159 (2006), and *Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613, 619 (5th Cir. 2020), to dismiss Plaintiff's Title II ADA and ADA retaliation claims likewise fails.

- First, Defendants do not—and cannot—contest TWC's statutory waiver of sovereign immunity under Section 504, which applies the identical substantive liability standards as Title II of the ADA. *See J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023).

- Second, *under Georgia*, 546 U.S. at 158–59, Title II validly abrogates Eleventh Amendment immunity where the alleged misconduct independently violates the Fourteenth Amendment. Here, Defendants' retaliatory stripping of services and property-depriving embargo violate Plaintiff's First and Fourth Amendment rights—both incorporated against the States through the Fourteenth Amendment—and TWC's refusal to provide accessible records during a statutory due process hearing implicates fundamental due-process access to

adjudicatory proceedings. *See Tennessee v. Lane*, 541 U.S. 509, 531, 533–34 (2004).

The Rule 12(b)(1) motion must be denied, compelling the Court to confront the verified Rule 12(b)(6) record below.

## II. DEFENDANTS' MOTION VIOLATES THE RULE 12(b)(6) MANDATORY STANDARD OF REVIEW

The TWC Defendants' Motion to Dismiss [ECF Doc. No. 62] is procedurally defective because it requires this Court to evaluate a fabricated factual vacuum rather than Plaintiff's actual pleading. Under Fed. R. Civ. P. 12(b)(6), this Court is mandated to accept all well-pleaded facts as true and must consider all anchored exhibits as part of the pleading pursuant to Fed. R. Civ. P. 10(c). [1]

Rather than accepting the verified record as true, Defendants rely on a calculated tactic of evidentiary omission to construct their defenses of Sovereign and Qualified Immunity. Defendants deliberately ignore:

### A. Documented Accommodation Breaches

The pre-existing August 2025 TXST Office of Disability Services mandates and Plaintiff's subsequent written justifications for necessary Assistive Technology. *(Exhibit U, 20251203 Plaintiff's written Assistive Technology justification provided*

---

[1] The following were directly referenced in Plaintiff's Amended Verified Complaint [ECF Doc. No. 53]: [ECF Doc. Nos. 1-4, 1-5, 11-1, 11-2, 11-3, 11-4, 16, 34-3, 35-9, 36-2, 36-3, 41-2, 42-1, 42-2, 44, 45-2, 49, 53-1, 53-2, 53-3, 53-4]

*to VRC Pickney)* [ECF Doc. No. 53-1], (*Exhibit V, 20260228 Plaintiff's written AT follow-up and Rehabilitation Act notice to TWC-VR staff*) [ECF Doc. No. 53-2], (*Exhibit T, 20260306 TWC Internal Case Notes Documenting TXST Inter-Agency Coordination*) [ECF Doc. No. 35-9], (*Exhibit T, [TWC-VR Due Process] Transcripts)* [ECF Doc. No. 11-1, at EXHIBIT T-F 000016–18, 000026–28; EXHIBIT T-G 000011; EXHIBIT T-H 000027]

**B. The Retaliatory Timeline**

Internal agency communications [ECF Doc. No. 11-4] explicitly linking the removal of Plaintiff's specialized Blind/Visually Impaired (BVI) services to Defendant Pickney's documented frustration with Plaintiff's protected civil rights advocacy.

**C. Proximate Cause of the Fourth Amendment Seizure**

Defendants executed a bad-faith financial embargo—despite on-the-record notice of Plaintiff's May 1, 2026 housing deadline—that directly triggered the May 20, 2026 eviction and July 21, 2026 spoliation of Plaintiff's $24,061.03 vocational and medical estate, and subsequently bypassed federal "stay-put" mandates to cement the deprivation. (*Exhibit W, 20260921 Bryant re Constructive Denial of Stay-Put*) [ECF Doc. No. 53-3], (*Exhibit B, 20260615 TXST Spoliation Ledger (Executed 07_21)*) [ECF Doc. No. 42-2], (*Exhibit B, 20261004 to TWC, TXST Notice of Spoliation Damages*) [ECF Doc. No. 45-2]

Because granting Defendants' motion requires the Court to actively bypass the verified record and participate in this factual omission, the motion must be denied as a matter of law.

## III. DEFENDANTS IGNORE ANCHORED EVIDENCE OF REQUESTED ACCOMMODATIONS AND MEANINGFUL ACCESS

Defendants assert that Plaintiff "fails to allege what, if any, accommodation he requested the TWC provide to assist him in 'accessing his own administrative records' or why such accommodation was needed," and claim Plaintiff failed to define "meaningful access" or plead resulting harm. [ECF Doc. No. 62 at p.9]

This fabricated evidentiary void is refuted by the verified record and incorporated exhibits, which the Court must accept as true under Rule 12(b)(6) and Rule 10(c):

### A. Objective Definition of "Meaningful Access"

As documented in (*Exhibit A*, *TXST Pattern of Noncompliance Items 1−94*) [ECF Doc. No. 36-2, at pp. 7, 11, 14 (Items 45, 75, 92) & pp.24–27], "meaningful access" is objectively defined by the technical accessibility standards of 1 Tex. Admin. Code Chapter 213 (promulgated under Tex. Gov't Code § 2054.451 et seq.), Section 508 of the Rehabilitation Act (29 U.S.C. § 794d), ISO 14289-1 (PDF/UA), and WCAG 2.1 Level AA—all of which require machine-readable, screen-reader-compatible electronic text rather than image-only scans.

### B. Specific Accommodations Requested

Anchored to the pre-existing August 2025 TXST Office of Disability Services (ODS) disability accommodation mandates, Plaintiff's written justifications explicitly requested Optical Character Recognition (OCR) formatting, an active Adobe Acrobat Pro license, and specific Assistive Technology to independently access TWC's inaccessible case files. [ECF Doc. No. 11-1, at EXHIBIT T-F 000015; EXHIBIT T-G 000002–08; EXHIBIT T-H 000003–08], [ECF Doc. No. 53-1], [ECF Doc. No. 53-2]

## C. Sworn Proof of TWC's Inaccessible Administrative Records

Regarding TWC's own case files, the authenticated administrative hearing transcripts establish that TWC produced roughly 20 unsearchable, image-only "dead" PDFs containing scanned images unusable by assistive technology. [ECF Doc. No. 11-1 at EXHIBIT T-G 000002–04]

Interim Director Michael Marler admitted on the record that TWC does not provide searchable case files and subsequently testified under oath that TWC refused to produce OCR-searchable PDFs—citing a $10,000 "undue burden" and demanding Plaintiff pay for the conversion under Tex. R. Civ. P. 196.4. [2] [ECF Doc. No. 11-1

[2] On May 4, 2026, in his *RESPONDENT'S RESPONSE TO APPELLANT'S REQUESTED FORMATTING OF VR CASEFILE*, Interim Director Michael Marler further doubled down on the VR client case file "pay wall" by asserting – *"Manual extraction of dozens of separate files and conversion of the files into the format requested would take at least three VR staff to leave their regular duties and work on the request for approximately two weeks. This plus gaining the software licenses these staff would need to do the work as security protocols prohibit using unsecure online tools. The combined cost of staff time and procurement is estimated to be at least $21,000."*

at EXHIBIT T-G 000005], [ECF Doc. No. 11-1 at EXHIBIT T-H 000003–04, 000007–08]

**D. Pled Injury-in-Fact**

The First Amended Complaint unambiguously pleads that this denial of digital access prevented Plaintiff from defending his IPE, directly contributing to a documented $60,000 career delay and derailing his planned post-baccalaureate MSCS graduate studies.

Because the incorporated exhibits specify the exact technical standards, the requested software and Assistive Technology, forensic proof of TWC's accessibility failures, and concrete injury, Defendants' failure-to-accommodate challenge fails under Rule 12(b)(6).

## IV. FIRST AMENDMENT AND STATUTORY RETALIATION ARE PROVEN BY INTERNAL AGENCY COMMUNICATIONS AND TWC'S PUBLISHED POLICY

Defendants attempt to dismiss Plaintiff's retaliation claims by arguing that stripping his Blind and Visually Impaired (BVI) designation was a routine clinical determination based on an eye exam, was "not an adverse action," and that calling the transfer a "downgrade" is "conclusory" because Plaintiff would "continue to receive assistance and support, just not specifically through the BVI program." [ECF Doc. No. 62 at p.10] TWC's own Vocational Rehabilitation Services Manual (VRSM) [3] (effective Nov. 20, 2026)—judicially

[3] VRSM, effective Nov. 20, 2026; available at: https://www.twc.texas.gov/programs/vocational-rehabilitation/vrsm

noticeable under Fed. R. Evid. 201(b)(2)—and internal agency records refute both claims.

### A. Material Adverse Action: Loss of Specialized, BLR-Exempt BVI Services

TWC's manual states that "TWC-VR staff specialization improves successful competitive integrated employment outcomes" and directs that customers with primary visual impairments be assigned to BVI-specialized VR Counselors (VRSM Part A, Ch. 3.3.a). Stripping Plaintiff's BVI status cuts off seven BVI-exclusive service categories under VRSM Part C, Ch. 6 (and Part B, Ch. 7, Proc. E):

- **BVI Assistive Technology Services (Ch. 6.1.a–6.1.b):** Eliminates Assistive Technology Unit (ATU) evaluations, Employment Assistance Specialist (EAS) planning and troubleshooting for postsecondary students, and Customer Technology Specialist (CTS) stock inventory—which expressly cover OCR and reader software (VRSM Part C, Ch. 5.2.i, Proc. E).

- **BVI-Exclusive Rehabilitation and Diagnostic Programs (Ch. 6.2–6.7):** Eliminates Criss Cole Rehabilitation Center (CCRC) training (Ch. 6.2), DeafBlind Services (Ch. 6.3), BVI Diabetes Self-Management Education (Ch. 6.4), Orientation and Mobility (O&M) Services (Ch. 6.5.a–6.5.b), Vocational Diagnostic Unit (VDU) evaluations (Ch. 6.6), and Vocational Rehabilitation Teacher (VRT) Services ("only for customers who are blind or visually impaired") (Ch. 6.7).

- **Loss of Cost-Sharing Exemptions and Mandatory Counseling**: All BVI Specialty Services and BVI AT are exempt from Basic Living Requirements

(BLR) and comparable-benefits rules (VRSM Part C, Ch. 2.3, Proc. E; Ch. 6.1.a–6.1.b), whereas general VR Rehabilitation Technology requires BLR cost-sharing. Confirming the downgrade in practice, TWC's RSA-911 records (Section V.E below) show TWC zeroed out Rehabilitation Technology reporting and eliminated mandatory in-house VR Counseling and Guidance (coun_guidance_provd_inh = NULL) immediately post-transfer, violating VRSM Part C, Ch. 3 (Policy B).

### B. Causal Link, Pretext, and Post-Hoc Extinguishment of Duty

- **Retaliatory Animus and Timing:** Internal agency communications [ECF Doc. No. 11-4] establish a direct temporal and causal link between Plaintiff's protected civil rights advocacy and Defendant Pickney's retaliatory transfer one week after his due process request.

- **Post-Hoc Liability Avoidance:** TWC-VR had already failed to deliver mandated BVI and Assistive Technology services despite Plaintiff's December 3, 2025, and February 28, 2026, written demands [ECF Doc. Nos. 53-1, 53-2]. Stripping BVI status was a post-hoc maneuver to extinguish TWC-VR's statutory and policy obligations rather than fulfill them.

- **Incomplete Exam and Policy Misstatement:** Defendants' claim that Plaintiff failed BVI criteria for lacking visual-field restrictions [ECF Doc. No. 62 at p.10] contradicts TWC's disjunctive BVI criteria, which independently cover any "Significant Visual Impairment" uncorrectable by standard glasses (VRSM Part A,

Ch. 3.3.a; Part B, Ch. 4, Policy C). The March 2026 eye exam was incomplete, yet VRC Pickney refused follow-up testing to lock in cherry-picked results supporting her premeditated downgrade.

## V. JUDICIAL NOTICE OF FEDERAL RSA-911 PUBLIC RECORDS FATALLY CONTRADICTS DEFENDANTS' NARRATIVE

In resolving a Rule 12(b)(6) motion, the Fifth Circuit expressly permits district courts to consider matters of public record and administrative agency documents without converting the motion into one for summary judgment. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

Pursuant to Federal Rule of Evidence 201(b)(2), Plaintiff requests this Court take Judicial Notice of:

- the attached federal RSA-911 Case Service Report data extract (Exhibit A, Exh_A_RSA_911_Data_Extract.pdf), created pursuant to Fed. R. Evid. 1006 from the native Excel file (TX0000591053_RSA_Data.xlsx) produced by Defendants on November 16, 2026, and authenticated by the accompanying Declaration of Mark L. Short; and,

- the corresponding schema data definitions contained in the Case-Service-Report-RSA-911_DCL-25-04.xlsx produced by the U.S. Department of Education. [4]

[4] Documented here: https://rsa.ed.gov/sites/default/files/subregulatory/DCL-25-04_0.pdf

This data file (TX0000591053_RSA_Data.xlsx) is an official administrative compliance record authored, certified, and submitted by TWC to the U.S. Department of Education. Accordingly, neither the authenticity and accuracy of the native file nor Exhibit A—a PDF-formatted subset of that exact data—can reasonably be questioned by Defendants. Cross-referencing the federal RSA submission dates against Defendants' representations in ECF 62 exposes several material discrepancies:

### A. Retaliatory Medical File Manipulation (Calendar Q1 2026: January 1 – March 31, 2026; PY 2025 Q3)

Defendants assert that the BVI case transfer was a routine clinical determination based on an eye exam. [ECF Doc. No. 62 at p.10] The RSA-911 extract confirms TWC reported purchasing Diagnostic Services during Calendar Q1 2026.[5]

Yet, in that same quarter, TWC erased Plaintiff's Primary Disability Code of 1;30 (Blindness), wiped his Secondary Disability Code from 16;30 (Other Physical Disabilities) to 0;0, and falsely reported his primary condition as 15;16 (General Physical Debilitation caused by Diabetes Mellitus). [6]

Simultaneously, TWC upgraded Plaintiff's Significance of Disability tier from 1 (Significant Disability) to 2 (Most Significant Disability)—the highest federal severity tier under 34 C.F.R. § 361.5(c)(29). [7]

---

5 (See Exhibit A at p.5, rsa_submit_dt = 3/31/2026, diag_treatment_provd_purch = 1)
6 (See Exhibit A at p.1, rsa_submit_dt = 3/31/2026, primary_disab = 15;16, secondary_disab = 0;0)
7 (See Exhibit A at p.1, rsa_submit_dt = 3/31/2026, significant_case = 2)

In Calendar Q2 2026 (April 1 – June 30, 2026; PY 2025 Q4), TWC silently restored both disability codes (1;30 and 16;30) while leaving the "Most Significant Disability" classification permanently locked in place.

Defendants cannot plausibly contend that stripping visual-impairment accommodations was justified for a consumer they simultaneously certified to federal regulators as having a "Most Significant Disability."

### B. Fabricated Multi-Track Educational Reporting (Jan – Dec 2025)

TWC's RSA-911 submissions repeatedly certified enrollment and Title I expenditures for educational programs Plaintiff never attended. Plaintiff was enrolled exclusively as an undergraduate pursuing a second Bachelor of Science degree in Electrical Engineering at TXST.

Yet, across Calendar Q1–Q3 2025 (January 1 – September 30, 2025; PY 2024 Q3 – PY 2025 Q1), TWC simultaneously reported purchasing both 4-Year Undergraduate Training totaling $11,151 and Graduate University Training totaling $6,867. [8] [9]

Aggravating this distortion, during Calendar Q3 2025 through Calendar Q4 2025 (July 1 – December 31, 2025; PY 2025 Q1–Q2), TWC also reported purchasing

[8] (See Exhibit A at p.3, rsa_submit_dt = 3/31/2025, 6/30/2025, 9/30/2025, four_yr_college_title_i = 7705, 571, 2875)

[9] (See Exhibit A at p.3, rsa_submit_dt = 3/31/2025, 9/30/2025, grad_college_title_i = 4866, 2001)

separate Occupational/Vocational Training certifying three concurrent educational tracks during Calendar Q3 2025 (July 1 – September 30, 2025) alone. [10]

Plaintiff explicitly asserts he received no Graduate University Training or Occupational/Vocational Training, ever, while in the TWC-VR program.

This pattern of certifying non-existent academic programs defeats any presumption of administrative regularity in Defendants' records.

### C. The Fraudulent Financial Embargo and "Active Status" Contradiction

Defendants claim they lawfully paused Plaintiff's supportive services because he was not actively participating in primary services. [ECF Doc. No. 62 at p.11]

The RSA-911 data proves otherwise. TWC reported to the federal government that Plaintiff's case remained continuously Active through Calendar Q3 2026 (September 30, 2026; PY 2026 Q1). [11]

Furthermore, TWC reported to the federal government that they actively purchased and provided maintenance services to Plaintiff throughout the exact period of the embargo. [12]

Defendants cannot claim to this Court that they paused a contract for non-participation while simultaneously reporting active maintenance disbursements

---

[10] (See Exhibit A at p.3, rsa_submit_dt = 9/30/2025, occ_voc_trng_provd_purch = 1)
[11] (See Exhibit A at p.7, rsa_submit_dt: 12/31/2024-9/30/2026, case_phase_cd = 14)
[12] (See Exhibit A at p.6, rsa_submit_dt = 6/30/2026, maintenance_provd_purch = 1)

and continuous "Active Services" compliance to secure federal funding metrics.

### D. The Contradicted "Non-Enrollment" Pretext and Unauthorized Transport Expenditure

Defendants attempt to justify pausing Plaintiff's supportive services—specifically citing transportation funding—by claiming Plaintiff was not actively enrolled at Texas State University. [ECF Doc. No. 62 at p.11]

- Although TWC failed to populate "enroll_postsec" for seven consecutive quarters while reporting $38,443 in college expenditures, its Calendar Q3 2026 submission (July 1 – September 30, 2026; PY 2026 Q1, updated October 1, 2026) officially certified that Plaintiff was continuously enrolled from January 1, 2025, through **September 4, 2026**.[13] [14]

  Defendants cannot claim to this Court that they legally withheld funding months prior due to "non-enrollment" when their own certified federal data confirms Plaintiff was actively enrolled. The RSA-911 data proves this justification is a post-hoc fabrication.

- Moreover, during Calendar Q2 2026 (April 1 – June 30, 2026; PY 2025 Q4)—the very window Defendants cite for non-enrollment—TWC certified expending $9,383 in Title I funds for 4-Year College Training and $200 in Title I funds to a

[13] (See Exhibit A at p.2, rsa_submit_dt = 9/30/2026, enroll_postsec_dt = 1/1/2025)
[14] (See Exhibit A at p.7, rsa_submit_dt = 9/30/2026, compltd_postsec_dt = 9/4/2026)

private transportation provider without a corresponding purchase authorization. [15]

Defendants' narrative relies on a fabricated timeline and fraudulent federal expenditures.

## E. Phantom Rehabilitation Technology Billing ($2,594) and Stripped Support

Defendants represent that Plaintiff would "continue to receive assistance and support" following the BVI transfer. [ECF Doc. No. 62 at p.10]

TWC's RSA-911 data contradicts this representation on two independent grounds.

1. First, TWC reported purchasing Rehabilitation Technology from a private vendor [16] in Calendar Q3 2025 (July 1 – September 30, 2025; PY 2025 Q1) and expending $2,594 in Title I federal funds [17] without a corresponding purchase indicator. [18] [19]

2. Second, from October 2025 onward, TWC zeroed out all Rehabilitation Technology reporting (NULL) and, immediately following the early-2026 BVI

---

15 (See Exhibit A at pp.3,6,5, rsa_submit_dt = 6/30/2026, four_yr_college_title_i = 9383, transport_title_i = 200, transport_provr = 4, transport_provd_purch = NULL)
16 (See Exhibit A at p.7, rsa_submit_dt = 9/30/2025, rehab_tech_provr = 4)
17 (See Exhibit A at p.7, rsa_submit_dt = 9/30/2025, rehab_tech_title_i = 2594)
18 (See Exhibit A at p.6, rsa_submit_dt = 9/30/2025, rehab_tech_provd_purch = NULL)
19 Plaintiff asserts he received no assistive technology, computer hardware, or software from TWC-VR; all assistive technology, computing hardware and software used by Plaintiff was privately purchased and provided – and except for a laptop, **was subsequently confiscated and/or destroyed by the defendants.**

transfer, eliminated in-house Counseling and Guidance [20] during Calendar Q2 2026 (April 1 – June 30, 2026; PY 2025 Q4).

### F. Unreceived Title I Maintenance Expenditures ($1,026)

Across four consecutive quarters from Calendar Q4 2024 through Calendar Q3 2025 (October 1, 2024 – September 30, 2025; PY 2024 Q2 – PY 2025 Q1), TWC certified expending $1,026 in Title I federal funds for Maintenance. [21]

Plaintiff never received these disbursements, receiving only the two subsequent $220 payments reported in Calendar Q1 and Q2 2026 ($440 total). Combined with the unreceived $2,594 Rehabilitation Technology payout and the unauthorized $200 Transportation expenditure, TWC's own federal reporting reflects $3,820 in Title I funds billed to Plaintiff's case without verified delivery or authorization.

## VI. PROXIMATE CAUSE OF THE FOURTH AMENDMENT SEIZURE AND SPOLIATION

Defendants attempt to sever their liability for the loss of Plaintiff's property by claiming TWC merely "ratified" Texas State's actions and that "a defendant cannot be held liable under § 1983 on a theory of vicarious liability." [ECF Doc. No. 62 at p.12]

Plaintiff does not plead vicarious liability under 42 U.S.C. § 1983; Plaintiff pleads direct causation. Under § 1983, a defendant is directly liable when they personally participate

---

20 (See Exhibit A at p.5, rsa_submit_dt = 6/30/2026, coun_guidance_provd_inh = NULL)
21 (See Exhibit A at p.6, rsa_submit_dt: 12/31/2024, 3/31/2025, 6/30/2025, 9/30/2025, maintenance_title_i: 445, 361, 110, and 110)

in or "set in motion a series of acts" they knew or reasonably should have known would cause others to inflict a constitutional injury. *See DeMarco v. Davis*, 914 F.3d 383, 390 (5th Cir. 2019) (quoting *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995)) (liability attaches where defendants are "personally involved in the constitutional violation or whose acts are causally connected to the constitutional violations alleged"); *Sims v. City of Madisonville*, 894 F.3d 632, 639 (5th Cir. 2018) (individual § 1983 liability "turns on traditional tort principles of 'but-for' causation").

The verified record demonstrates that Defendants' actions were the direct, proximate cause of the Fourth Amendment seizure. Despite explicit on-the-record notice of Plaintiff's imminent May 1, 2026, housing liability deadline, Defendants executed a bad-faith financial embargo and withheld mandatory interim relief—directly triggering the May 20, 2026, eviction and the July 21, 2026, state-sponsored spoliation of Plaintiff's $24,061.03 personal, professional, educational, and vocational estate, including the physical tools required to achieve his active IPE goal. [ECF Doc. No. 11-1, at EXHIBIT T-H 000018–19], [ECF Doc. No. 42-2], [ECF Doc. No. 45-2]

Defendants then cemented this deprivation by consciously bypassing federal "stay-put" protections and refusing to restore funding or remediate Plaintiff's ongoing displacement. [ECF Doc. No. 53-3]

## VII. DEFENDANTS' ACTIONS INVERT AND VIOLATE THE WIOA STATUTORY MANDATE

Defendants attempt to defeat *Ex parte Young* by claiming they were merely "complying with their statutory duties in administering Plaintiff's VR services." [ECF Doc. No. 62 at p.

12] Under Tex. Lab. Code § 352.001(10), VR services are statutorily authorized to "compensate an individual with a disability for a substantial impediment to employment so that the individual may engage in a remunerative occupation." Defendants cannot claim statutory compliance for executing a coordinated embargo that stripped a disabled electrical engineering student of 99% of his medical, educational, professional, and vocational assets, destroying the exact earning capacity and infrastructure the statute was enacted to protect.

Qualified Immunity Does Not Shield Defendants Bryant, Marler, or Pickney. To overcome qualified immunity at the Rule 12(b)(6) stage, Plaintiff must plead (1) a violation of a constitutional right that (2) was clearly established at the time of the conduct. *Stramaski v. Lawley*, 44 F.4th 318, 328 (5th Cir. 2022). Both prongs are met here:

- **First Amendment Retaliation (Clearly Established):** Defendants' own cited authority—*Keenan v. Tejeda*, 290 F.3d 252, 261 (5th Cir. 2002)—establishes that "government retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable." Id. (citing *Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996)). Because the verified internal emails [ECF Doc. No. 11-4] and certified RSA-911 manipulation prove Defendants stripped Plaintiff's BVI services and altered his disability codes to punish protected civil rights advocacy, no reasonable official could believe such retaliation was lawful.

- **Fourth Amendment Property Seizure (Clearly Established):** The Supreme Court has long held that the Fourth Amendment protects property interests against unreasonable state seizures in civil eviction contexts, not merely criminal

investigations. *Soldal v. Cook Cnty.*, 506 U.S. 56, 61–63 (1992) ("our cases unmistakably hold that the [Fourth] Amendment protects property as well as privacy"). Because Defendants Marler and Bryant consciously triggered the foreseeable eviction and destruction of Plaintiff's $24,061.03 estate despite explicit on-the-record notice of the May 1, 2026, housing deadline, their conduct violated clearly established constitutional law.

Accordingly, Plaintiff's *Ex parte Young* claim and individual-capacity claims under 42 U.S.C. § 1983 survive dismissal.

## VIII. CONCLUSION

To grant Defendants' motion, this Court would be required to impermissibly resolve factual disputes in Defendants' favor, deliberately ignore the anchored Rule 10(c) exhibits, and disregard and/or contradict the agency's own federal RSA-911 compliance data.

Because Plaintiff has pled plausible claims for relief backed by irrefutable documentary proof, Defendants' Motion to Dismiss must be denied in its entirety.

Respectfully submitted,

*/s/ Mark L. Short*

_______________________

**Mark L. Short**, BSCS
Plaintiff, *Pro Se*
3220 69th St H8
Galveston, Texas 77551
Phone: (940) 337-7005
Email: markl_short@yahoo.com

Dated: November 20, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on November 20, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

**Counsel for TWC Defendants:**

**Elizabeth Bryan**
Assistant Attorney General
General Litigation Division
Office of the Attorney General of Texas
P.O. Box 12548
Capitol Station, MC-019
Austin, TX 78711-2548
Phone: (737) 230-4700
Email: elizabeth.bryan@oag.texas.gov

I further certify that because my severe physical disabilities (vision and mobility) and lack of transportation render physical mailing impossible, a true and correct copy of the foregoing was served via electronic mail on November 20, 2026, to the official university email addresses of the following unrepresented Defendants:

Texas State University (via TSUS General Counsel)
Email: tsusgencoun@txstate.edu

Dr. Kelly Damphousse
Email: president@txstate.edu

Dr. Cecil Richard Compeau Jr.
Email: crc194@txstate.edu

Kate Gannon-Cullinan, DHRL Director
Email: dhrldirector@txstate.edu

Respectfully Submitted,

*/s/ Mark L. Short*

______________________________

Mark L. Short, BSCS
Plaintiff, *Pro Se*
3220 69th St H8
Galveston, Texas 77551
Phone: (940) 337-7005
Email: markl_short@yahoo.com

Dated: November 20, 2026